With that, we will proceed. Mr. Tabbitt, you may begin. Thank you, Your Honor. May it please the Court, my name is Cesar Tabbitt. I represent the Appellant and the Cross Appellee, USI. I would like to reserve five minutes for rebuttal. This is a breach of contract case against an insurance broker based solely on the name of AIG Insurance Company that issued the policy, either Illinois National Insurance or Insurance Company of Pennsylvania. It is undisputed that all of the terms of the insurance policies were identical. That's the county brief at page 40. It also is undisputed that the county sued both insurance companies, Illinois National and Pennsylvania, and obtained more than the full amount of the insurance. That's county brief page 16 and 17. USI should have been granted judgment as a matter of law for four reasons. First, the two-year statute of limitations barred the claims based on the Supreme Court's recent holding in American Family v. Crown. Second, there was no breach of contract based on the terms of the written contract between USI and Cook County. Third, there was no causation because the insurance policy that USI obtained from Pennsylvania, by its plain language and the undisputed facts, actually provided the coverage. And fourth, there were no damages because the county sued both insurance companies, Illinois National and Pennsylvania, and obtained more than the full amount of the insurance. With respect to the two-year statute of limitations, the county admits that the Pennsylvania policy is plain and unambiguous. That's the county brief at page 35, 36, and 37. The county also admits that you can understand the policy simply by reading the plain language. That's the county brief at page 37 and 38. Finally, it is undisputed that the county received the policy on June 27, 2007, and that it did not sue until more than five years later on July 19, 2012. Under the crop decision, all claims are barred because they were not filed within two years of the county's receipt of the policy. Crop recognizes only a narrow exception to that clear two-year rule. The exception only applies where the policyholder reasonably could not be expected to learn the extent of coverage by reading the policy. Here, the county admits that the policy language is clear and that you can understand the extent of coverage simply by reading the language. Again, that's at the county brief, page 37 and 38. The county now makes two arguments to try to fit within the narrow exception in crop. First, it argues in its most recent brief that the name of the insurance company, Pennsylvania, did not appear on the plain language of the policy. That is simply not true. On page one of the policy, the policy clearly states it is issued from Pennsylvania and not Illinois National. The record site is E at 794. That was USI Trial Exhibit 11, page one. Second, the county argues that USI made some kind of misrepresentation when it said the name of the insurance company would not make a difference. First of all, that's not a misrepresentation. It's a true statement. The name did not make a difference based on the plain language of the policy and the identical terms of the Illinois national policy. But second, even if that were a misrepresentation, it's not the kind of misrepresentation that fits within the narrow exception of crop. Crop held that the narrow exception only applies where the policyholder could not read the policy and reasonably be expected to understand the extent of coverage. Also, crop rejected a very similar argument. In crop, the policyholder alleged that it changed its homeowner's policy from travelers to American family based on an alleged misrepresentation that the American family policy, the new policy, would be as good or better than the prior traveler's policy. The Supreme Court rejected that argument and said that alleged misrepresentation is not enough to bring the case within the exception because the misrepresentation must somehow prevent the policyholder from reading the policy and understanding its terms. The same result applies here. All the cases cited in crop and all the cases since crop are consistent. In the recent case from the first district, Austin Highlands, the court affirmed the dismissal based on statute of limitations based on the two-year rule. In Grocey and in Philippe, the courts affirmed the dismissal based on the statute of limitations. The county now relies on one case called PAPE, but PAPE is completely distinguishable. It did not involve an issue of the scope of insurance coverage. Instead, it involved an issue regarding premium financing for life insurance policy, and the premium financing issue was not reflected on the language of the policy. Instead, it was reflected in internal documents from the insurance company that the policyholder never received. Finally, the statute of limitations is a bar for one further reason. It's undisputed that after the county received the policy in June 2007, it received a letter from the insurance companies on February 20, 2008, and in that letter, the insurance companies listed seven defenses to coverage, and one defense was section 3F, the issue that the county now raises before this court. It is undisputed that the county had actual knowledge of that actual defense on February 20, 2008, and yet the county did not file suit until more than four and a half years after it received actual knowledge. The statute of limitations bars all claims, and the court does not need to reach any other issues. With respect to no breach of contract, briefly, your honor, section 3 of the contract imposes a duty on USI to obtain a proposed policy subject to review and approval or rejection by the county within 60 days. Section 4 of the contract by its terms imposes a duty on the county to either review and approve or reject the policy within 60 days. The contract also has a complete integration clause at general condition 31. Under the contract, the county cannot review and accept the policy, use the policy for five years, and obtain benefits under the policy for five years, and then sue and claim it didn't want the policy. That's precisely what happened here. The county argues that the contract required USI only to obtain Illinois National. That's not true based on the plain language. The county argues that the contract required USI to provide legal advice or any other kind of advice on the scope of coverage. That's not true. No provision in the contract says that. The county argues that USI breached six other provisions somehow by getting Pennsylvania instead of Illinois National. None of those provisions impose a duty on USI to provide legal advice or any other advice on the scope of coverage, and none of those alleged breaches or duties involve or in any way change the county's duty to either review and accept or review and object and reject the policy. We ask that the court enforce the terms of the written contract as written. With respect to causation, the issue of causation boils down to an issue of the interpretation of an insurance policy. The narrow question is did section 3F of the policy bar the county's new claim based on a new and wholly independent wrongful act? No facts are in dispute. The parties admit in their briefs that the county's new claim under the 2007 policy involved a new wrongful act that was, quote, wholly unrelated to the prior wrongful acts alleged in the earlier lawsuit and that the new wrongful act was not a continuous repeated or related wrongful act. Those facts are undisputed in this appeal based on the appellate record. That's the county brief at page 7, page 12, and page 35 and 36. So the narrow question of law for this court is does section 3F by its terms apply to a new wrongful act, does it bar a new wrongful act, or does it only apply to a continuous repeated or related wrongful act? And here, based on the construction of the insurance policy, the plain language clearly applies only to, quote, continuous repeated or related wrongful acts. Nothing in section 3F applies by its terms to a new wrongful act. Second, the insurance company's position on the defenses and the wrongful defenses to coverage. No, at no time did the insurance company say section 3F applies to a new wrongful act. It always said we are not covering because your wrongful act is an old or related wrongful act. In every single piece of evidence from the insurance company, they always said section 3F only applies to a continuous repeated or related wrongful act. They never said it applies to a new wrongful act. They wrongfully denied because they claimed wrongly that the wrongful act asserted by Cook County was an old wrongful act and they knew about it before. That was not true. They wrongfully denied. Finally, no court ever has held that section 3F applies to a new wrongful act. All the cases, all the cases by the plain language apply 3F only to a new wrongful act. Established canons of policy construction provide that the court should not read one of three sentences in section 3F in isolation. There are three sentences and instead established canons of construction provide that the court should read all three sentences together in harmony, in conjunction with each other. For all those reasons, there is no causation because the policy that USI got based on the undisputed facts actually provided coverage for the county's claim and the insurance companies wrongfully denied. Finally, your honors, with respect to damages, this is not... I'm sorry, your honor. Please sum it up. Okay, with respect to damages briefly, this is the county's triple recovery. There's undisputed. In 2007, they received the policy. In 2010, they sold their coverage under the Pennsylvania policy for a $25 million benefit, a $25 million reduction in the settlement amount of the underlying class action strip search claims. They actually sold the coverage under the Pennsylvania policy and received a $25 million benefit. Then they sued both insurance companies and received a $52 million settlement. Then they sued USI to get a triple recovery based on the same policy. For all those reasons, there are no damages and we ask that the justice... Justice House, do you have questions at this time? Well, going to the statute of limitations, in addition to just reading the policy, they were... The county was assured by its expert that there's no difference in the policies. Doesn't that take it into the exception? I think that it does not, your honor, for two reasons. First, under the crop case, the crop court reversed established precedent and said that the broker is not a fiduciary. The broker is not a fiduciary except in limited circumstances that are not at issue. The broker is not a fiduciary related to the procurement of a policy. So they only owed a contract duty to obtain a proposed policy. Second, crop says that the only exception applies if the policy is ambiguous or contains contradictory terms, or there's some other reason why it could not be reasonably expected that the policyholder would read the policy and understand its terms. And here, that exception doesn't apply. And I would add that in crop, the policyholder was a family that relied on a similar alleged representation. Here we have Cook County with a risk insurance department, experts in insurance, and they were represented at all times by lawyers who actually reviewed the issues. And so on this record, there's no basis for the court to say that the county could not be reasonably expected to understand the scope of coverage. Finally, the whole theory of the case, as argued to the jury, is that the policy is plain and unambiguous. Anybody can understand it. Simply read section 3F. So the exception, we think, Your Honor, does not apply based on these facts. Any other questions, Justice House? No, I have no other questions. Thank you. Justice Copps, do you have any questions at this time? Well, my question is really related to or similar to Justice House's question. The language or the information about the carrier is clear on both the binder and on the policy, but the county relied on USI's representation that the difference in carriers was of no moment. So doesn't that then kick it into, I mean, how would the county have any knowledge with respect to a difference when USI, its broker, is asserting that there is no difference? Your Honor, I think that the answer is set forth in CROP. And in CROP, a very similar issue with a very similar alleged misrepresentation. First, I want to emphasize this 100%. The difference in the insurance policies did not make a difference. The terms of the policies were identical. The only difference was the name of the insurance company, and Cook County knew that. It knew that. It's undisputed. It's on page one. The county argues it made a difference, but where is there evidence that it made a difference? They say, well, it made a difference based on the plain language of Section 3F. There's no expert that said it made a difference. In fact, our expert, Mr. Filio, testified it made no difference. It made no difference because there was coverage under the Pennsylvania policy, so it made no difference. And based on the undisputed facts, when you look at Section 3F, it doesn't apply to bar the claim. On this record, there is argument, but there's no evidence that the name actually made a difference. So there's no evidence that there was a misrepresentation. But second, even if there was, CROP cites to two cases, Philippe and Grochi, and those cases involved alleged misrepresentations where the court said those misrepresentations are not enough. The burden is on the policyholder to read and understand the extent of coverage. The rule used to be much different. I know that issued the first decision in CROP, and it was a decision that was accurately based on existing case law at the time. But the Supreme Court respectfully rejected that argument, set forth in Justice Cobb's very detailed opinion. And the Supreme Court said, no, the duty to read and understand a policy is on the policyholder. It's not on the broker, because we reject by statute, any fiduciary duty on the broker. And the Supreme Court held that there's a statute called the Illinois Insurance Producers Act that controls and it removes any fiduciary duty on the broker. And the duty is on the policyholder to read and understand its terms, except in rare circumstances. And when the court reads all the cases cited by CROP, for the exception, the court will see every single case rejected a claim based on a misrepresentation to extend the statute of limitations. Philippe rejected the claim. Grouchy rejected the claim. And CROP, significantly, CROP rejected an almost identical argument. Justice Cobb, any other questions? No other questions. All right, I have a question or two. Mr. Tabat, in the CROP case, first of all, there was no broker involved in the discussions, correct? Yes, Your Honor. All right. And also, in the CROP case, the policy that was issued actually omitted language that the homeowners had previously had in their policy. Is that correct? Yes, Your Honor. Well, isn't, I mean, that's one of the facts. I think they were looking for coverage for what kind of an action? They were looking for coverage for an invasion of privacy defamation action. Yes. And that language had been in their earlier policy. They would have been covered in their earlier policy. And in the new policy, the language was absent. Yes, Your Honor. All right. And unlike this case, you've emphasized many times now, that the language is actually identical in both policies. Yes, Your Honor. Correct? Yes. And yet, the insurance companies denied coverage for multiple years. And this was involving the same language that the policyholder here, the county, had in both policies. True? Yes, Your Honor. Yes. All right. And so they, and also one other thing, they sought out Mr. Wilson and USI for specialized knowledge regarding the procurement of insurance. Wasn't there testimony in the record on that before the jury? Yes, there was, Your Honor. All right. All right. Now, the only other question I have is, you said that the county claimed the benefits of this policy, and we're talking about the 2007 policy, for five years. Is that right? Yes. What do you mean that they claimed the benefit? The insurance company had refused coverage for all those years. Had it not? Your Honor, here's what I meant. Okay. Okay. The 2007 policy from Pennsylvania is a liability policy where the county made approximately 400 different claims under that policy. It's in the record. It was not a policy for one claim. It was a policy for all liability claims. So ambulance injuries, personal injuries, wrongful police arrests, et cetera. They made 400 or more claims under that policy, number one. Number two, when it came time to settle the underlying class action, again, they made claims for 400 claims under the policy. But when it came time to settle the young class action, they actually used the policy to settle the case. The plaintiffs in underlying case said, we need $80 million to settle it. The county said, we'll give you $55 million and our claim to coverage under the Pennsylvania policy. And the underlying plaintiffs accepted that. They used the policy and sold the coverage to get a $25 million benefit. At the same, okay. But at the same time, the county actually came up with what? $45 million in cash in addition to, because the plaintiffs wanted $80 million and the county settled for $55 million plus the assignment of their rights. So had they had the 20, I'm sorry, had they had the $10 million from the insurance companies and then the excess carrier, another $10 million, there's $20 million they came up with in cash to settle the case. Is that right? Well, what they do- In addition to their SRI. Yes. So they had, they're deductible of $10 million and then they had $10 million from the 2006 insurance policies. Right. And then they went to the plaintiffs and the plaintiffs said, we need $80 million. So the county said, okay, well, we have to pay, we don't have $80 million, but what we can do is get $10 insurance companies and we'll come up with $45 million ourself. So that gets to $55 million and we'll sell you, we'll give you our claims to coverage under the Pennsylvania policy. And the underlying plaintiffs took that. So instead of paying $80 million, they paid in $45 million. Plus they assigned their claims to the insurance coverage under the Pennsylvania policy. Your honor, but also the court distinguished or raised some distinguishing facts in the crop case. And I want to just go back briefly. Well, I'm sorry, judge. You are going to have time again for rebuttal with the crop case, but if you can briefly tell us. Briefly judge crop involved an insurance agent, not an insurance broker, but crop went on to say that is a distinction that doesn't make a difference. That crop specifically said the distinction between an agent and a broker does not apply. I think, I think we understand that. Okay. And then second judge, this misrepresentation, again, it's really an identical misrepresentation to the one election crop, but even beyond that. Who misrepresented anything in crop? It was allegedly the agent who delivered the policy. The agent said the policy that I'm getting you is quote as good or better and quote, and the traveler's policy. That was not true here. Allegedly us. I said, here's the policy. It's from Pennsylvania, not Illinois national. You know, in our view, the name does not make a difference. First, the name did not make a difference based on this record. But second, even if it did, and it did it 100% based on the plain language, section three F does not bar a new claim. The court has to interpret that. And I think under established canons of construction, it just doesn't bar that claim. It doesn't make a difference. But even if it did, that's not the kind of misrepresentation that fits within that exception and crop. And it's undisputed that the County had actual notice of three F and the 20 2008. So even if you accept the argument, we have time for rebuttal, we're going to have to, we're going to have to move here. Justice Cobbs or Justice House. Any further questions at this time? Mr. Tabbitt? Nothing for me. Thank you, Your Honors. All right. Now we're going to hear Thank you, Mr. We're going to hear from Mr. Blonder. Correct? Yes, and I'm a special states attorney appointed to represent Cook County in this matter, stand before you asking that you affirm the jury's verdict and not substitute your, your perception for the jury's findings of fact, based on the Evans before it, with the exception of an editor issue that Mr. Lovie will address with respect to the cross appeal. Certain of the facts here are undisputed. And I heard Mr. Tabbitt use that word multiple times in his argument, but it ignored the undisputed, certain of the undisputed facts in the record, which are essential to understanding what happened here. The County paid more than half a million dollars, in fact, $600,000 to U S I pursuant to a written contract, procure it in Illinois national insurance policy, the Illinois national exemplars attached to the RFP, which is incorporated into the contract. What they got was an 80 page policy. Actually, they initially got a binder from Illinois national, which indicated it would conform five months later when the policy actually issued, it was issued under the insurance company of the state of Pennsylvania. The undisputed testimony is that U S I provided the policy to the County, the County read and reviewed the policy, the risk management department, Lisa Waller testified at trial. The undisputed testimony is that Lisa Wallach asked Nancy McIntosh, the representative of U S I the vice president, whether the change in carriers would make a difference for coverage. She was told it would make no difference. She was wrong, which the result was multiple years later, when it came time to address the young case, which was pending in federal court, the policy wasn't there to provide coverage. The county came out of pocket and had to settle the case. The county used its own funds. In addition to funds obtained from a different insurance policy that it should not have had to use the public trust. The public funds had to be used because the insurance that had been procured by U S I didn't cover the alleged harm, even though U S I had specifically told the county at time that the change in carriers wouldn't matter. The testimony at trial was undisputed from Frank Catania and from Tony Beloulus, both and from Jason Rosenthal. You had three witnesses who testified that the change in coverage mattered. Now for purposes of this appeal, U S I tries to avoid that testimony by saying it was impermissible legal conclusions. However, that's not an objection that they made at trial. And that objection was waived by virtue of them not making that objection at trial. They had multiple witnesses at trial who testified to that. Mr. Tabat references, Mr. Filio, one of their experts at trial. And obviously the jury rejected Mr. Filio's testimony and credited the testimony of Mr. Rosenthal and Mr. Beloulus. The fundamental issue here now in this case is crop and the statute of limitations. Mr. Tabat addressed it, judges Cobbs, justice house, justice McBride, you all addressed it in your questions. And I want to focus on crop because it doesn't bar this claim. Crop from the Illinois Supreme provides for the two year rule with exceptions. Contrary to what was suggested previously, the exceptions listed in crop are not an absolute list. Just as crop itself is not an absolute two year rule. In the crop case that gives examples of the types of circumstances, which may be objections. And what it does is it references effectively crop takes a discovery rule and says a party has an obligation to read and understand its policy. And if it, because an injury happens when you receive the policy. However, if there are circumstances by which when you read the policy, you either can't understand it because it's contradictions or something else about the policy precludes you from understanding it. The statute, the claim may accrue at a later point in time. That's this case. Unlike the suggestion in the prior argument, there's no allegation in crop of any misrepresentation being made. What it crop says is the plaintiffs asked for a policy that was equal or better at the time they sought the policy, not at the time they received the and they're not that at the time the crops received the policy, they read it under recognized a difference and asked a question about it. It might be closer to this case, but those aren't the facts in the case. The facts in the case say at the time they ordered the policy time, they sought it. They asked for a policy that was equal to or better than the traveler's policy. The facts are also undisputed in crop that the plaintiffs didn't read the policy and understand the policy when they received it. So again, this is a very different case than crop factually, because here the county reviewed the policy and they asked a specific question about the policy. And by the way, the suggestion that the county's lawyers were involved in doing that is a misnomer. It was Lisa Wallach, who was the head of the risk management department for the county at that time. Mr. Catania and others in the state's attorneys may have been consulted from time to time. They were not the experts on insurance coverage for that. It was Mr. Wilson and his team who were the trusted advisors, which is the way they sold themselves to the county. So crop says in certain circumstances, there's a hard and fast two not. This is one of those circumstances. Because here, again, there was no way, yes, the language of the policy is plain, the language that's there. Anyone who looks at the policy sees that Illinois National is not listed, but the insurance company of Pennsylvania is. But the impact of that was not known and could not have been known to the county at the time they received the policy. The second kind of issue, and if you look at crop, the cases that crop relies on, Philip, Grouchy, and others get to the same place. And the results of the cases may be different based on the underlying facts. But the law and the principles of law is the same, which essentially means the party needs to be in a position to understand that it's been injured, i.e. it didn't get the policy it thought it should get. And Philip, for example, they talk about representations of the agent and whether or not those can override the duty to read the policy. Grouchy addresses the same issue. And again, so the cases that crop relies on enforce the position here and support the position here, that when you read the policy, look at it and ask questions, then your claim, you're not on notice that there's an issue with your policy. And that's the fundamental difference in this case is the fact that Lisa Wallach asked the question. By the way, there's no dispute in the record that she asked that question. Mr. Tabbitt tries to then argue, and Justice McBride, you asked the question directly about what do you mean by they use policy to their benefit? First of all, the jury finding based on the evidence, they specifically rejected and it's in special interrogatory number four, that Cook County in any way ratified the policy. And Mr. Caesar, Mr. Tabbitt was going there when he said the county's approval and acceptance. And the jury specifically rejected that based on the facts in front of it. The second issue, though, is when Mr. Tabbitt talks about the county using the policy. Under the argument that he just advanced, effectively, any time a party assigns any rights under an insurance policy, it would be using that policy. And therefore, there'd be no claim against the insurer, the insurer producer, or the agent. That's not the law in Illinois. That hasn't been the law. That isn't the law. And if I go out on a limb, that won't be the law in the future. Effectively, the county was faced with crippling liability. And it did an assignment of certain rights of a bad faith claim of whatever other claim there could be. At the time that the county did that, Mr. Wilson testified, they thought that the assignment was worthless. That was the testimony at trial that this jury heard was they didn't think the assignment had any value. In fact, it was Mr. Wilson who was advocating that the county do the assignment. He was a supporter of it. Now, he's turning around, the USI is turning around because it turns out that that assignment may have been more valuable than anyone thought. But that's hindsight looking backwards. The practical here is the county didn't use its policy. If the county had received coverage under the policy, then it would have been using its policy. And the fact that there were 400 plus claims that were asserted during a period against the policy, that's not the use of the policy that we're talking about as a matter of law. We talked about the use of the policy for the claim that's here. And whatever policy was in place would have been there to cover the 400 or 500 however many claims it was. Essentially, Mr. Blondie, you're gonna have to sum up now because all right, essentially, what USI is asking is that the court to revisit the jury verdict and disregard the testimony, Mr. Volus, Mr. Rosenthal, Mr. Catania, and all the other witnesses on the effect of the policy, the effect of the policy language, the fact that there was no coverage, and that it wasn't until 2010. Even then, at the earliest that coverage was actually denied, and there was no dispute based on the jury finding that this claim was filed within two years of that. You have 2010 versus 2012. There's no issue there. So as I said, we ask that you affirm the jury verdict on this point, subject to the editor issues, the Mr. Lobiel address and the cross appeal. All right, Justice House, any questions at this point for Mr. Blonder? No. And Justice Cobbs? No question. All right. I do not have any questions at this time either. So we're going to allow, I think I indicated it would be now we'll move to the cross appeal. All right, Mr. Tabin, you're going to have time in your response to respond to Mr. Blonder and the cross appeal. Thank you, Your Honor. So Mr. Lovey. Thank you, Your Honor. May it please the court. And also, please keep in mind that we're cutting, you know, the time has to be maximized as much as possible. All right. All right. And I will try to keep it brief. I think for the purposes of the cross appeal, just a little context here. Cook County sought insurance for an important reason. The public funds are precious. They realized their coverage was inadequate. They decided they wanted to increase their coverage against lawsuits to $20 million. They hired USI and they paid them $600,000 to guide them through that process. They could have sought their own insurance, but they didn't feel that they were as well placed as USI was to be their advisors. And the contract specifically says, USI will find the insurance, will review the policies that will act in the best interest, and it will continue to maintain the coverage as appropriate. USI failed to do that. When it came time to invoke the policies, when the county was facing exposure on the young strip search case, the insurance company said, we're not paying. These are flawed policies. You have no coverage. The county said, wait a minute. We paid the premiums all those years. Where's our $20 million in coverage? And the insurance company refused to pay. And just as a little background on this, which carrier mattered, the insurance company invoked section 3F, which said that in the year notices provided to us, and by switching the carriers, they were able to make an argument that that nullified the coverage because Illinois National was supposed to be the carrier, supposed to be a new carrier. But when they went back to the old carrier, they were able to argue that there was no coverage. And Mr. Tabatha, I've heard him argue a thousand times both this morning and at our last trial that the name didn't make a difference. But if he was right, then they would have paid the county $20 million. Instead, they stood on their objection and the county got nothing. We've been arguing for more than 10 years about what this policy means. And I've heard Mr. Tabatha say this morning, oh, it's obvious. Anybody could read the policy. If it's obvious, why have we been arguing for 10 years about why there was coverage? Why did the insurance companies refuse to pay? And most importantly, why have two juries now found, two juries, that the coverage was flawed and that county was damaged as a result? So how does that get to the cross appeal? What the cross appeal argues is that as a matter of law, the county is also entitled to consequential damages, and that's not disputed. And as a matter of law, the jury found that the county was entitled to consequential damages, but the purpose of the cross appeal is they calculated the consequential damages wrong. So what are the consequential damages in this case? The county found themselves under real fire. They had the strip search case. They're facing billions of dollars of liability. They needed to resolve the case. And as Justice McBride pointed out, they had about $40 million. They didn't have enough. There was testimony at the USI trial that Mr. Catania said, if I had the 20 million that the insurance company wasn't paying us, if we would have real insurance at work, I could have resolved the case. So Justice McBride, you said it was, you accepted their premise that it was 80 versus 55. That's not set in stone. Catania said, if I would have had 20 more million, I could have got the thing resolved. And that wasn't contradictory. He didn't have 20 million because USI failed to get them proper coverage. So what Frank did and what the county did was we said, take all the money we got, and we will also assign you the rights to chase the insurance company. So that's what they did. They got the case resolved for all the county's money plus the assignment. And they had to give up the assignment because they didn't have the extra 20 million that would have got to come. That is consequential damages. Now, fast forward, the case against the insurance company went to trial, there was a big verdict. The insurance company violated the False Crimes Act, and $52 million was awarded to the county. But the county didn't get $52 million. The county then had to write a check for $32.5 million to the young relators. That's the damages. That's the assignment. The assignment that they signed over to resolve the case turned out to be worth $32.5 million. And if they hadn't been forced to assign away their rights, they would have kept the $32.5 million. The county needs $32.5 million. It shouldn't have had to assign it away. We won at trial, I will reemphasize, the jury found that there were consequential damages. And Judge Mulroy properly held that that was a jury question. So where the jury went wrong is in the limited respect that they should have awarded not half a million dollars, which bore no rational resemblance to the evidence whatsoever. It's just a made up number. They should have awarded the actual damages, which were $32.5 million. So we argue that Judge Mulroy should have, and that this court, should direct the circuit court to enter an editor for $32 million to make the proper amount of damages, or on an issue limited to damages, resubmit it to the jury, because a half million dollars has no rational relationship. So either direct the court to add the $32 million, or give a new trial limited to the issue of damage. On the issue of damages, so that's, that's the issue on the consequential damage. There's also the issue of mitigation. At trial, the jury awarded the $20 million that USI breached its contract and denied the county, but it reduced the $20 million by 10. And Mr. Tabitha should not have been permitted to argue to the jury that the jury should reduce the damages and mitigate the damages by 10, because the county caused its own harm by continuing to strip search. And we objected, and sometimes those objections were sustained, but Mr. Tabitha was able to convey to the jury that the $20 million in lost insurance coverage should be reduced by the county's own conduct in strip searching. That is not a proper mitigation argument. There should have been no mitigation. So what this court should do cleanly is just strike out the mitigation and reinstate the $20 million. It is not a defense to a breach of contract for an insurance policy to say, well, if you hadn't strip searched, then you wouldn't have caused the problem. That's like, as we said in our brief, that's like saying we're suing Stroger Hospital and we have insurance for malpractice, but hey, your doctor shouldn't have been committing malpractice, so we're going to mitigate the insurance. That's not a thing. Your honors should reverse the mitigation award too and should reinstate the original $20 less the set-off. Your honor, I'm going to be complicit in the time. I know you don't want people to go on and on, but that in a nutshell is where we are on the I'd be happy to answer questions. Oh, you're muted, Justice. Justice McBride, you're muted. I know. I apologize. Justice House, any questions at this time for Mr. Loewe? No, thank you. And Justice Copps, any questions? And I don't have any questions on the cross appeal at this time. All right. So now we're going to return to Mr. Tabbitt and you will have some time, Mr. Loewe, a few minutes, very briefly after for your reply or rebuttal to the cross appeal. All right. Okay. Now you're going to proceed on your response to Mr. Blonder and to Mr. Loewe. Thank you, your honor. I understand. Okay. So first, counsel says USI was paid $600,000. It's a little misleading. It's set forth in our brief. We were paid $600,000, but not to procure the policy for 2007. We were paid $600,000 to Cook County and other services. The exact services, there are many, most of which have nothing to do with procurement of a policy are detailed in the contract. First of all, with respect to procurement of this policy, I believe that the total amount of money that we were paid was $200,000. That's the first thing. The second, counsel says that the name made a difference and they don't dispute the plain language of section 3F. They don't dispute that it's clear and unambiguous and they don't dispute that anybody could understand the terms by reading it. What they say is the name made a difference because of testimony explained by Mr. Rosenthal. First of all, Mr. Rosenthal did not say the name made a difference in the record. Second of all, Mr. Catania and Mr. Volulius did offer that opinion. They were not disclosed as legal experts. They were not disclosed as experts on the issue of the construction of the policy. The only testimony from an expert was from Mr. Filio, who testified the name does not make a difference. Second, the county tries to argue that the testimony that the name made a difference was lay opinion under Rule 702. It's clearly not lay opinion. Lay opinion is only admissible if it's based on actual perception. These lawyers had nothing to do with the Pennsylvania policy or the Illinois national policy and let me emphasize both insurance companies were represented by the same lawyer in the underlying coverage case. There was no conflict and both insurance companies said we are not paying for the exact same reason. Both insurance companies said we are not paying because the new wrongful act that the county asserts under the 2007 policy is not a new wrongful act. Both said we're not paying because what you're asserting is an old wrongful act or a related wrongful act and here's what it is. In 2006, the strip search procedure at Cook County was called a warehouse procedure. 100 men were put in a hallway between the jail and 26th and California sued and said the warehouse strip search procedure is wrong. In 2007, Cook County correctly changed that procedure to an entirely new procedure. It's called the privacy divider procedure. That was completely new, wholly unrelated. That was a new claim under the 2007 policy. Then Cook County changed that procedure again to call it an L3 strip search procedure with scanners like you have at the airport. Again, a whole new wrongful act under the 2007 and 2008 policy. When you read section 3F and when you apply the undisputed facts, entirely new strip search procedure from warehouse strip search to privacy divider to L3 and there's an admission from all the parties this is new, wholly unrelated. The narrow legal question is does it make a difference under section 3F? Does 3F bar a new wrongful act based on the privacy divider strip search procedure and based on the L3 scanner procedure? The answer is absolute 100 percent no. Based on the plain language, court rulings, no court has ever held what the county is asking you to hold now. Most importantly, Mr. Loewe says it's a flawed policy. The policy was not flawed. The policy provided coverage. There was nothing flawed in the policy. The problem was the insurance company incorrectly, incorrectly, and wrongly said the privacy divider strip search procedure and the L3 strip search procedure are not new procedures. They're old procedures or related procedures and therefore under both policies, under both policies, Illinois National and Pennsylvania, there's no coverage. You'll have to sum up now. Your honor, with respect to mitigation, briefly there is clear undisputed testimony that not only did the county have coverage under the Pennsylvania policy in 2007, it also had coverage under the Pennsylvania policy in 2008. That set forth in our affirmative defense and in their reply to our affirmative defense. They had 10 million dollars of coverage in 2008 that the county forfeited. That was in evidence. That's the basis for the 10 million dollar mitigation plan. Finally, your honor, what I'll say is this. Insurance companies all the time regularly deny coverage wrongly. Policyholders all the time sue in court to get coverage. This court many times every year deals with insurance coverage cases and decides those terms of the policy. Here, the insurance companies wrongly denied. USI said you have coverage if you have a new claim. You do not have coverage if you have an old or related claim. Both insurance companies wrongly denied because they claimed there was an old or related claim under both policies. Both policies do not cover old claims. Both policies do not cover related claims. Both policies only cover new claims and here the county admits there's a new claim. For all those reasons, we ask that the court reverse and enter direct the entry of judgment for USI. Thank you. Mr. Lovi, briefly. Thank you, Mr. Tabbitt. Mr. Lovi, you may reply now very briefly. Thank you, your honor. What is striking about that argument is how he failed to engage with the consequential damages argument. The county lost 32.5 million dollars because they had to give away this assignment. They wrote a check that they shouldn't have to write. This court should enter the editor or should should send it back down for a proper allocation of damages. Mr. Tabitha didn't address it at all and the county needs the money and that's the county's money and had USI not breached its duties, the county would have kept that 32 million dollars. You know, I'm listening to Mr. Tabitha say again that new privacy acts and privacy dividers and new wrongful acts. Those are the arguments he made to the jury. Those are the arguments the jury rejected. USI breached its contractual obligation to provide the county insurance and when the county needed the 20 million dollars, the insurance companies didn't pay and they, USI got paid for those services. They failed to deliver them. Krupp is good law. Nobody is taking issue with the Krupp case but what Krupp said is there are circumstances when it's appropriate to go beyond the bright line and these are those circumstances. The county's advice was the name change didn't matter. Mr. Tabitha this morning is telling you the name change didn't matter. It's like they're doubling down on bad advice. Well, guess what? It mattered and it mattered because the insurance company didn't pay and two juries have now found that both the insurance, that basically that USI breached its duty. So that's one jury on the USI. Thank you. I apologize. I did not ask Justice Copps or Justice House if they had any questions for Mr. Tabitha but do you have any questions now for Mr. Lofi? No questions. I have one question. If USI had not breached, allegedly breached the contract, there wouldn't have been any 32 million dollars to be had, is it? Is that, am I wrong? Well, the way the world played out was there was an assignment. So, you know, that's a hypothetical but as things turned out, there was a 52 million dollar verdict or 52 million dollar settlement. The county received into its coffers 52 million dollars and it had to cut a check for 32 million dollars and it should have been able to keep that 32 million dollars. But the point, there would not have been a cause of action if there had not been an alleged breach. If there had not been an alleged breach, then they would, well, they still would have, if they would have paid the 20 million dollars, then there might not have been an assignment. That is true. But then the damages should be 20 million dollars. But, you know, again, I return to my answer, Justice House, which is that's how it would have been but we know what did happen. What did happen was the county paid 32 million dollars. It shouldn't have been. All right. Thank you. And any further questions, Justice House or Justice Copps of Mr. Cabot? No. No. All right. All right. I would like, on behalf of all of us, the panel members, to thank you for the Zoom presentations today. The case was well argued, well briefed, and we will take it under advisement and we are now adjourned on this matter.